### BENJAMIN FRANKLIN v. THE STATE.

#### No. 1810.  Decided June 14, 1899.

**1.  Juror and Jury Law—Conscientious Scruples.**

On a trial for murder, where the court held certain jurors incompetent because of conscientious scruples against the infliction of the death penalty in cases of circumstantial evidence, Held, in the absence of any showing that the case was not one of purely circumstantial evidence, it will be assumed that the action of the court was correct.

**2.  Murder—Evidence—Declarations of Deceased.**

On a trial for murder, it was not error to refuse to permit proof of a bare statement of deceased, not shown to have been a dying declaration, and which was made some days after he was shot, to the effect that it was his fault, that he struck defendant, and if his friends had not interfered he would have fixed him.

**3.  Self-Defense—Requested Instructions.**

Where the court has given a correct charge on self-defense fully covering that phase of the case as presented by the evidence, it is not error to refuse requested instructions upon that issue.

**4.  Murder—Argument of Counsel.**

On a trial for murder, where the district attorney in his closing argument to the jury said, "Crime is on the increase in this State; and crimes of this kind,—the negro boy and his six-shooter in these dives violating the laws against gambling,—are getting too frequent, and you should make an example of this big, strong man," etc.; Held, that for aught that appears the remarks were not unauthorized, and they can not be considered improper where it is not shown that defendant has been prejudiced thereby.

**5.  Improper Remarks of Counsel.**

The court should not allow remarks of the district attorney, made with the purpose to belittle defendant's exceptions. Counsel has at all times a right, in a proper manner, to reserve a bill of exceptions to supposed errors, and, in taking his bill, he has the right to be treated in a respectful manner.

**6.  Murder—Cause of Death—Gross Neglect or Improper Treatment.**

On a trial for murder, where it appeared that, in the opinion of the physician, death might not have resulted had deceased submitted to amputation of his leg, which he refused to do until it was too late, Held, the refusal of a person shot to have his limb amputated can not be imputed to him as gross neglect or manifestly improper treatment. A wound resulting in death constitutes the killing, though the individual might have recovered had he used proper care or submitted to a surgical operation which he refused.

**7.  Same—Proximate Cause of Death.**

Where death results from disease brought on directly by a wound inflicted by defendant, and there is no manifest improper treatment or gross neglect of the wounds, defendant can not be heard to say that his act was not the proximate cause of the death.

APPEAL from the District Court of Bexar. Tried below before Hon. ROBERT B. GREEN.

Appeal from a conviction of manslaughter; penalty, two years imprisonment in the penitentiary.

The indictment charged appellant with the murder of Tom Little, on the 31st day of December, 1898, by shooting him with a pistol. The important facts are very concisely but sufficiently stated in the opinion.

No brief for appellant has come to the hands of the Reporter.

*Rob't A. John,* Assistant Attorney-General, for the State.—Conscientious scruples against the infliction of the death penalty, in cases of circumstantial evidence, have been held to disqualify a juror. Shafer v. State, 7 Texas Crim. App., 239; Clanton v. State, 13 Texas Crim. App., 139, 1 Bish. Crim. Proc., 918; Thompson v. State, 19 Texas Crim. App., 613; Kennedy v. State, 19 Texas Crim. App., 619; White v. State, 16 Texas Crim. App., 218; Gonzales v. State, 31 Texas Crim. Rep., 510; Sawyer v. State, 39 Texas Crim. Rep., 557.

But, even conceding that the court erred in disqualifying the jurors, no injury to appellant is shown, appellant not having been convicted of a capital offense, but of manslaughter. Riddles v. State, 46 S. W. Rep., 1068.

As to the proposed proof of the statement made by deceased, that if his friends had not interfered he would have fixed him so that he could not have done it, the same was not part of the res gestae, not a dying declaration, not made for the purpose of impeaching a dying declaration, and was hearsay and inadmissible. Whart. Crim. Ev., sec. 296; Harris v. State, 1 Texas Crim. App., 74. The charge of the court upon reasonable apprehension of danger was a correct presentation of the law under the approved precedents. Price v. State, 36 Texas Crim. Rep., 405; Cochran v. State, 28 Texas Crim. App., 422; Word v. State, 30 Texas Crim. App., 687; Penal Code, art. 676.

The court charged articles 652 and 653, Penal Code. Appellant does not complain of the charge, but the verdict based upon the same, and contends that deceased's refusal to permit a serious and dangerous operation was gross negligence, and that negligence caused the death, instead of the wound he inflicted.

Article 653 says that the "gross negligence and manifestly improper treatment" that is the direct cause of the death, taking it beyond the purview of culpable homicide, "has reference to the act of some other person than him who inflicted the first injury, as of the physician, nurse, or other attendant." Manifestly this does not refer to the act of the injured party; hence the refusal of the injured party to submit to the operation of amputating his leg does not come within the meaning of the article. The fact that the deceased refused to permit amputation is not the gross neglect "of nurse, physician, or other

attendant." In order to save appellant the punishment for his criminal act, the deceased did not have to submit to having his leg cut off. He was placed in the desperate condition he was in by the culpable act of appellant. He had the right to take his chances of recovery without amputation, if he desired; and his choice should not and does not increase or diminish appellant's guilt. On this subject Judge Ector in Williams' case, 2 Texas Criminal Appeals, 282, said:

"The general rule of both law and reason, independent of said article 2204 of our Code, is that, whenever a wound is inflicted under circumstances which render the party inflicting it criminally responsible, if death follows, the person inflicting the wound will be held responsible for the homicide, though the person wounded would have died from other causes, or would have died from this one had not others operated with it, provided the wound really contributed mediately or immediately to the death. Mr. Bishop lays down the correct rule of law on this question, in which he says: 'The doctrine is established that if the blow caused the death it is sufficient, though the individual might have recovered had he used proper care himself, or submitted to a surgical operation to which he refused submission, or had the surgeons treated the wounds properly. So, also, if the person would have died from some other cause already operating, yet, if the wound hastened the termination of life, this is enough. But where the wound was not of itself mortal, and the party died in consequence solely of improper treatment, not at all of the wound, the result is otherwise. This last proposition, however, is practically dangerous, because, in law, if the person dies by the action of the wound and by the medical or surgical action, jointly, the wound must clearly be regarded sufficiently a cause of the death. And the wound need not even be a concurrent cause, much less need it be the next proximate one; for, if it is the cause of the cause, no more is required.' 2 Bish. Crim. Law, sec. 680, and cases cited in notes; 1 Hale P. C., 428; 3 Greenl. on Ev., sec. 139; 1 Russ on Cr., 505.

"The shooting of deceased by defendant, and the inflicting thereby the wound on the leg of the deceased, are clearly proved. The first physician called in wanted immediately to amputate the leg. The second physician, Dr. McLendon, though he thought at first he could save the leg notwithstanding it was a compound fracture, some days after his first visit found the deceased in a very low condition, the wound suppurating, and was obliged to amputate the limb. This physician also says: 'In my opinion the amputation of the leg was necessary to save his life.' There is no proof that deceased was neglected or unskillfully treated."

This authority is quoted and approved by Judge White in Hart v. State, 15 Texas Criminal Appeals, 231. On this point Professor Greenleaf says: "If death ensues from a mortal wound in malice, but not in its nature mortal, but which being neglected or mismanaged the party died, this will not excuse the prisoner who gave it; but he will be held

guilty of murder." But our statute says he will be excused (as to homicide) if it be "grossly neglected or manifestly improperly treated" by physician, nurse, or other attendant. Thus the rule laid down by Mr. Greenleaf applies as the rule at common law, except when the statute applies.

HENDERSON, Judge.—Appellant was, convicted of manslaughter, and his punishment assed at two years confinement in the penitentiary, and he appeals.

The homicide occurred in a casual difficulty at a saloon in the city of San Antonio. Deceased applied to appellant, who was keeping the bar, for another deck of cards, and was informed that he had none, and a quarrel ensued. Deceased, who was a larger man, slapped defendant in the face, and one or two of the witnesses say that he knocked him down. Defendant then got a pistol, and shot deceased in the left leg, just above the knee. Nine days thereafter deceased died, as claimed by the State, from the effects of the wound in question.

Appellant reserved a bill of exceptions to the action of the court sustaining the objection of the State to certain jurors, on the ground that they were opposed to the infliction of capital punishment for a crime in cases involving circumstantial evidence. The bill does not show whether the case was one of purely circumstantial evidence; and, looking to the bill alone, we assume in favor of the action of the court that it acted properly.

There was no error in the action of the court refusing to permit defendant to prove by witnesses that deceased declared some time before his death that it was his fault that he struck defendant, and, if his friends had not interfered, he would have fixed him so he could not have done it. This was not shown to be either res gestae or dying declarations. It was a bare statement of deceased, made some days after he was shot, and as such, was not admissible in evidence.

Appellant asked a charge on self-defense. The charge requested recited certain facts claimed to have been proved by the testimony. Without discussing the propriety or legality of the charge in question, we would say that the court gave a correct charge on the subject of self-defense, fully covering that phase of the case as presented in the evidence.

The district attorney, in his closing argument, made these remarks: "Crime is on the increase in this State, and crimes of this kind, the negro boy and his six-shooter, in these dives, violating the laws against gambling are getting too frequent; and you, gentlemen of the jury, should make an example of this big, strong man, stronger than any man on the jury, and break up this reputation for crime this section of the country has." We are not prepared to say that this part of the bill shows anything reprehensible. For aught that appears, the remarks of the district attorney were not unauthorized. At any rate it is not shown that they were calculated to unduly prejudice appellant.

The latter part of the bill, however, does show conduct reprehensible on the part of the district attorney. When appellant's counsel arose to reserve his bill of exceptions, the district attorney remarked, "Yes, take a bill of exceptions to everything I say. It is all excepted to,—everything I say excepted to." We would observe here that counsel has a right at all times during the progress of the case, in proper manner, to reserve a bill of exceptions to any action of the court or counsel deemed improper, and he has a right at all times in taking his bill of exceptions to be treated in a respectful manner. No doubt the purpose of the district attorney was to belittle his exception. This course of practice should not be allowed.

Appellant insists that the verdict of the jury is contrary to the court's charge and the evidence adduced on the trial. And, in this connection, he urges that the testimony of Dr. Cameron shows that the wound inflicted was not necessarily a fatal wound; that no bone of the leg was broken, but the bullet merely cut the main artery of the leg; that he was called in on the same day after the wound was inflicted to see the patient, and he advised amputation of the limb to prevent blood poison, but that deceased and his mother refused to permit it at that time; that several days afterwards blood poison was manifest, and deceased was then willing for the limb to be amputated, which was not done, it being too late. He gave it as his opinion that, if deceased had followed his advice and permitted the amputation at the time he was first called, he did not think he would have died. He further testified that he attended deceased daily, and sometimes went to see him two or three times a day, and four or five days after the wound was inflicted he noticed under the toe nail of the wounded leg a dark spot that he recognized as the incipient appearances of gangrene or blood poison; that the bullet caused the gangrene or blood poison, and deceased died from the blood poison; that, in his opinion, deceased did not die from the immediate effects of the shot; that the shot was not necessarily fatal, and the shock from the bullet striking and making the wound did not produce death; that he could not say that deceased would certainly have lived had the amputation been performed. He further stated that there was no malpractice or gross neglect in the treatment of deceased, save and except the refusal of deceased to permit his limb to be amputated when he was first called in. The court gave the following charge on this subject, which we quote: "You are instructed that homicide is the destruction of the life of one human being by the act, agency, procurement, or culpable omission of another. The destruction of life must be complete by such act or agency. But, although the injury which caused death might not under other circumstances have proved fatal, yet, if such injury be the cause of death, without its appearing that there has been any great neglect or manifestly improper treatment by some other person, such as the physician, the deceased, the nurse, or other attendant, it would be homicide; and if you believe from the evidence that some one shot

the deceased, and inflicted upon him a wound which was not necessarily mortal, and that the wound inflicted produced blood poisoning, or any other effect which would result in the death of the deceased, the party inflicting the injury would be as guilty as if the wound was one which would of itself inevitably lead to death, unless it appears that there was great neglect or manifest improper treatment by some other person, such as a physician, the deceased, the nurse, or some other attendant. You are instructed that, if the wound inflicted would not necessarily result in death, and it appears that there has been any gross neglect or improper treatment of the party injured, by the physician, the deceased, the nurse, or other attendant, it is not homicide in him who inflicts the first injury. But, if the injury, though not necessarily fatal, yet, if said injury results in death, then it would amount to homicide, unless it appears that there has been gross neglect or improper treatment of the person injured by physician, the deceased himself, the nurse, or other attendant." We do not understand that appellant contends this charge is erroneous, but that on it and the testimony in that connection appellant should have been acquitted of felonious homicide. We do not understand our statute on the subject which exonerates a defendant where it appears that there has been any gross neglect or manifest improper treatment of the person injured to apply to a case of this character. Arts. 652, 653, Penal Code. It is not like the case where a person receives a wound not necessarily fatal, and takes some disease in nowise connected with or superinduced by the wound, and dies therefrom. Nor in our opinion can it be said that, because of the wound inflicted, the person injured was called on to decided whether or not, under the advice of a physician, he would have the limb amputated, that his failure or refusal to have such limb amputated can be termed gross neglect or manifestly improper treatment. The percentage of deaths from an amputation of the leg above the knee is considerable, and the testimony of a physician that a person may or may not get well is more or less speculative. Gangrene or blood poisoning had not set in when the physician gave this advice, nor does he state that blood poisoning would not have set in if the amputation had taken place. We hold that this refusal of the person shot under the circumstances to have his limb amputated can not be imputed to him as gross neglect or manifestly improper treatment. We quote Mr. Bishop, on this subject, as follows: "The doctrine is established that a blow resulting in death constitutes a killing, though the individual might have recovered had he used proper care or submitted to a surgical operation, which he refused. It is a killing, though the man would not have died had the surgeon treated the would properly, or had the medical attendant used due skill. So that the death is the combined result of the wound and the maltreatment. And where an injury was inflicted by a blow, which incompetent medical judgment rendered an operation advisable, preliminary to which chloroform was administered, and during its administration the

patient died, and but for it he would not have died, it was ruled that the blow would be the cause of the death, within the law of felonious homicide. And so death resulting from a disease brought on by the wound is regarded as death from the wound, and it is the same when resulting from an amputation which the wound made necessary." 2 Bish. Crim. Law, sec. 638; Hart v. State, 15 Texas Crim. App., 202; Hale, P. C., 428; Commonwealth v. McPike, 3 Cush., 181. As stated above, the physician's opinion that deceased would have gotten well had he permitted the amputation was more or less speculative on his part. We do not understand the physician to say that in every case where the main artery of the leg is penetrated or cut, and the party does not immediately bleed to death, blood poisoning is bound to follow; and, unless such be the case, it could scarcely be said that deceased was guilty of gross neglect or manifest improper treatment by taking the chance of saving his limb, although he may have refused to take the advice of the physician in the matter. This is not in conflict with the construction of our statute laid down in Morgan v. State, 16 Texas Criminal Appeals, 593. The refusal of deceased to have his limb amputated, under the circumstances, was neither preventing nor aiding in the fatal effects of the injury received. It is sufficient to say in this case that death resulted from a disease brought on directly by the wound which was inflicted by appellant; and, the proof showing that there was no manifest improper treatment or gross neglect of this wound after its infliction, appellant can not say that his act was not the proximate cause of the death of the deceased. The charge of the court fairly submitted all the issues in the case, and gave defendant the benefit, not only of manslaughter, but of aggravated assault and self-defense. The jury found him guilty of manslaughter, and, in our opinion, the evidence amply sustains this verdict. The judgment is affirmed.

*Affirmed.*